

**Exhibit 1**

Netwatch USA LLC
199 Wells Avenue
Newton, MA 02459

857.284.8009
usahq@netwatchsystem.com

## Managed Service Agreement

| | | | |
|---|---|---|---|
| Subscriber Name | Royal Sun Farm LLC | Phone | |
| Site Address | 69 Gardener Rd | Cell | |
| City | Hubbardston | Email | info@royalstonfarm.com |
| State & ZIP | MA  01452 | Site Reference | |
| Billing Contact | Damon Schmidt | Site Contact | Damon Schmidt |

**Netwatch Managed Service Fee**

| | |
|---|---|
| Daily Managed Service Fee | $200.97 |
| Quarterly Managed Service Fee | $18,338.51 |
| Sales Tax @ 6.25 % | $1,146.16 |
| Quarterly Invoice (including Sales Tax) | $19,484.67 |
| Labor Fee | $31,750 |

**Netwatch Schedules**

- Schedule 1 (Equipment) approved
- Schedule 2 (ACH Form) completed
- Schedule 3 (Protocol) completed
- Schedule 4 (Map) approved

---

### 1  Schedule of Netwatch Equipment

| Item | Qty | Specification | Item | Qty | Specification |
|---|---|---|---|---|---|
| Video Gateway Unit | 2 | | PA System<br>PC c/w Monitor | 2<br>1 | 1 Internal/ 1 External |
| Internal Cameras<br>External Cameras | 8<br>43 | | Keypad<br>UPS | 1<br>1 | |
| Audible Panic Buttons<br>Silent HU Panic Buttons | 3<br>3 | | Hikvision Unit<br>Intruder Network | 1<br>1 | |
| Door Contacts<br>Overhead Door Contacts | 3<br>3 | | Glass Break | 6 | |
| Detection | 51 | VERITAS | Door Access Control<br>AC Network | 5<br>1 | |

### Authorized Signatories

I confirm that as Subscriber to this Agreement I have read, understood and agree to the terms and conditions of the attached Agreement and that the above Schedule of Netwatch Equipment represents an accurate record of the Equipment to be installed at the Monitored Property.

| | | | |
|---|---|---|---|
| Subscriber Signature | *Damon Schmidt* (DocuSigned) | Netwatch Signature | *Thomas Walsh* (DocuSigned) |
| Print Name | Damon Schmidt | Print Name | Thomas Walsh |
| Position | Owner | Position | Sales Director CRO |
| Date | 3/28/2021 | Date | 3/24/2021 |

DocuSign Envelope ID: 1A3DA693-B94A-4908-A99B-56AC5091F66F



Netwatch USA LLC
199 Wells Avenue
Newton, MA 02459

857.284.8009
usahq@netwatchsystem.com

## Managed Service Agreement

| | | | |
|---|---|---|---|
| Subscriber Name | Royal Sun Farm LLC | Account Contact | Damon Schmidt |
| Legal Entity ID | MA  001436049 | Phone | |
| Subscriber Address | 130 South Royalston Rd | Cell | |
| City | Royalston | Email | info@royalstonfarm.com |
| State & ZIP | MA 01368 | Account Ref: | |

## Authorized Signatories

I confirm that as Subscriber to this Agreement I have read, understood and agree to the terms and conditions of the attached Agreement and that a completed Purchase Order form with Schedules for each new Monitored Property will be considered part of this Agreement.

| | | | |
|---|---|---|---|
| Subscriber Signature | *Damon Schmidt* (DocuSigned by: 456914398B5C451...) | Netwatch Signature | *Thomas Walsh* (DocuSigned by: 5766E442E0174B5...) |
| Print Name | Damon Schmidt | Print Name | Thomas Walsh |
| Position | Owner | Position | Sales Director CRO |
| Date | 3/28/2021 | Date | 3/24/2021 |

# AGREEMENT FOR NETWATCH USA, LLC ("Company") MANAGED SERVICE

1. Glossary

"Agreement" refers to this legal and binding contract, Subscriber's purchase order and Company's acceptance of it, or Subscriber's acceptance of a quotation for Services by Company under Clause 2.2.

"Alarm Condition(s)" means any condition(s) arising at the Monitored Property requiring action by Company, with reference to the Protocol.

"Communication Hub" means the command center as designated by Company from which the Monitoring Service may be provided from time to time for the duration of the Agreement.

"Communications Path" means the various communications media used to carry a signal from the Netwatch System to the Receiving Equipment including but not limited to a telephone or internet connection.

"Commencement Date" the date on which the Netwatch System begins recording locally at the Monitored Property.

"Daily Managed Service Fee" means the daily fee that is charged by Company to Subscriber.

"Emergency Services" means Police, Fire Department, Ambulance or any other emergency response services as may be appropriate to be notified in the event of an Alarm Condition; but shall not include any person at a Monitored Property as property manager, a Subscriber employee, or present for any other reason.

"Equipment" means any equipment, including, but not limited to, CCTV, cameras, access control equipment, tools, cabling or facilities owned or provided by Company or its subcontractors and used directly or indirectly in the supply of the Services.

"Fees" means the Managed Service Fee and the Labor Fee plus applicable taxes.

"Installation Date" means the date at which installation of Equipment begins for a given Monitored Property.

"Labor Fee" means the fee that is payable by Subscriber to Company upon signing this agreement for the installation of the Netwatch System at the Monitored Property plus applicable taxes.

"Managed Service Fee" means the fees payable by Subscriber to Company on a quarterly basis in advance for the Services to be rendered and which are calculated by reference to the Daily Managed Service Fee plus applicable taxes.

"Manager" means the limited number of active personnel duly authorized by Company to execute, acknowledge, deliver, and/or record any instrument purporting to affect an interest in real property.

"Monitored Property" means the property or portion of the property of Subscriber at which the Services are provided and the Netwatch System is installed.

"Netwatch System" means the intruder, fire or other electronic monitoring or signaling system, installed at the Monitored Property.

"Protocol" means the instructions setting out the action(s) to be taken on the occurrence of an Alarm Condition, in the form attached at Schedule 3 signed by Subscriber and provided to Company prior to the Commencement Date, as well as any written amendments provided by Subscriber to Company during the Term.

"Receiving Equipment" means the equipment installed at the Communication Hub which receives signals from the Netwatch System through the Communications Path and translates the signals into audible signals and/or visual display.

"Schedules" means the standardized addenda utilized to specify some aspect of the installation of Equipment, monitoring of property, establishment or amendment of the Protocol governing responses generated therefrom, or any other element deemed necessary by Company to the ongoing monitoring of the property during the Term.

"Services" means (1) the monitoring service whereby the Netwatch System is installed at the Monitored Property, (2) the hiring and maintenance of Equipment, and (3) any other related services which may be provided by Company to Subscriber from time to time with the agreement of Subscriber.

"Subscriber" means the person, organization, corporation, or other legal entity that subscribes to the Services pursuant to this Agreement and includes successors, assigns or personal representatives, including but not limited to, authorized employees or agents.

"Term" means five (5) years from the Commencement Date of each Monitored Property and any extension thereof in accordance with Clause 3.2.

1.1 Captions and section headings used herein are for convenience only, and are not a part of this Agreement, and shall not be used in construing it.

1.2 A person includes a natural person, corporate or unincorporated body (whether or not having separate legal personality).

1.3 All named Schedules form part of the Agreement, if signed by Subscriber and accepted by Company.

1.4 A reference to writing or written material includes e-mail.

1.5 Electronic signatures from Manager(s) shall be fully binding for purposes of this Agreement.

1.6 The term "year" shall mean a period of 365 days from a defined date (or, where the period includes a February 29th, 366 days).

1.7 Any obligation in this Agreement on a person not to do something includes, without limitation, an obligation not to agree, allow, permit or acquiesce in that thing being done.

2. Application

2.1 This Agreement shall prevail over any inconsistent terms or conditions contained, or referred to, in Subscriber's purchase order, confirmation of order, acceptance of a proposal, or specification or other document supplied by Subscriber, or implied by law, trade custom, practice or course of dealing.

2.2 Subscriber's purchase order, or Subscriber's acceptance of a quotation for Services by Company, constitutes an offer by Subscriber to purchase the Services under this Agreement. No offer placed by Subscriber shall be accepted by Company other than --

2.2.1 by a written acknowledgement issued and executed by Company; or
2.2.2 (if earlier) by Company starting to provide Services, or
2.2.3 on signing of this Agreement by Subscriber;

-- when a contract for the supply and purchase of the Services under this Agreement will be established. Subscriber's terms and conditions (if any) attached to, enclosed with or referred to in any purchase order or other document shall not govern the Agreement. (Clause 2.2 cont.)

2.3 Quotations are given by Company on the basis that no Agreement shall come into existence except in accordance with Clause 2.2. Any quotation is valid for a period of thirty (30) days from its date, provided that Company has not previously withdrawn it.

3. Commencement and Duration

3.1 The Term for each Monitored Property shall begin on the Commencement Date of that Monitored Property.

3.2 Subject to Clause 12, Services supplied under this Agreement shall continue for the stated Term.

3.3 Following the conclusion of the initial Term, this Agreement shall automatically renew for a subsequent term of five (5) years unless terminated by one of the parties, in writing, and with no less than sixty (60) days' notice. (See Clause 12 – Termination)

4. Charges and Payment

4.1 In consideration of the provision of the Services by Company, Subscriber shall pay the Fees. Subscriber shall be informed of the Daily Managed Service Fee and the Labor Fee prior to the Commencement Date.

4.2 The Labor Fee shall be paid by Subscriber to Company prior to the Commencement Date. The Labor Fee is a non-refundable payment made by Subscriber upon signing this Agreement. Managed Service Fee plus all applicable taxes, shall be paid by Subscriber to Company quarterly, in advance, in full and in cleared funds without deduction or counterclaim.

4.3 Company may increase the Fees in line with Consumer Price Index provided that the Fees shall not be increased more than once in any twelve (12) month period and Subscriber shall be given sixty (60) days' notice.

4.4 Fees shall be transferred by direct debit to a bank account nominated by Company. All Fees shall be paid in US Dollars (USD). The first installment of Managed Service Fees shall be paid prior to the Commencement Date.

4.5 In the event that for any reason the Fees are not paid via AutoPay Enrollment, any bank or other transaction fees incurred by Company in processing such payment shall be borne by Subscriber.

4.6 If any additional services are provided by Company, outside of this Agreement and any Schedules attached thereto, an additional fee shall be charged which shall be agreed in advance with Subscriber.

4.7 Without prejudice to any other right or remedy that it may have, if Subscriber fails to pay Company on the due date, Company may:

4.7.1 charge interest on such sum from the due date for payment at twelve percent (12%) annually, or the highest rate allowed by law, accruing on a daily basis and being compounded quarterly until payment is made, whether before or after any judgment and Subscriber shall pay the interest immediately on demand; and/or

4.7.2 suspend all Services until payment has been made in full.

4.8 Time shall be of the essence in regards to payments scheduled under this Agreement.

4.9 All sums payable to Company under this Agreement shall be due immediately on its termination, despite any other provision. This is without prejudice to any right to claim for interest under the law, or any such right under the Agreement.

4.10 If Company's performance of its obligations under this Agreement is prevented or delayed by any act or omission of Subscriber including the non-payment of overdue Fees, Subscriber shall be liable to Company, for all reasonable costs incurred arising therefrom including, but not limited to, the cost of restoring the Services. Any such work shall be carried out by Company at its standard charge out rates as applicable at the time.

4.11 Company may, without prejudice to any other rights it may have, offset any liability of Subscriber to Company against any liability of Company to Subscriber.

5. Intellectual Property Rights

5.1 As between Subscriber and Company, all Intellectual Property Rights in products and materials developed by Company in relation to the Services shall be owned by Company. Company licenses all such rights to Subscriber free of charge and on a non-exclusive, worldwide basis to such extent as is necessary to enable the Subscriber to make reasonable use of the Services. If the Agreement terminates, this license shall automatically terminate.

6. Confidentiality and Company's Property

6.1 Subscriber shall keep in strict confidence all technical or commercial know-how, specifications, inventions, processes or initiatives which are of a confidential nature and have been disclosed to Subscriber by Company, its employees, agents, consultants or subcontractors and any other confidential information concerning Company's business or its products which Subscriber may obtain.

6.2 Subscriber may disclose such information:

6.2.1 to its employees, officers, representatives, advisers, agents or subcontractors who need to know such information for the purposes of carrying out Subscriber's obligations under the Agreement; and

6.2.2 as may be required by law, court order or any governmental or regulatory authority.

6.3 Subscriber shall ensure that its employees, officers, representatives, advisers, agents or subcontractors to whom it discloses such information comply with this clause.

6.4 Subscriber shall not use any such information for any purpose other than to perform its obligations under the Agreement.

6.5 All materials, equipment and tools, drawings, specifications and data supplied by Company to Subscriber (including the Equipment) shall, at all times, be and remain the exclusive property of Company, but shall be held by Subscriber in safe custody at its own risk and maintained and kept in good condition by Subscriber until returned to Company, and shall not be disposed of or used other than in accordance with Company's written instructions or authorization.

7. Subscriber Obligations

7.1 Subscriber agrees to:

7.1.1 co-operate with Company in all matters relating to the Services provided;

7.1.2 provide Company, its agents, subcontractors, consultants and employees, in a timely manner and at no charge, access to the Monitored Property, office accommodation, data or other facilities as reasonably required by Company;

7.1.3 provide to Company, in a timely manner, the Protocol and any other information as Company may require to provide the Services and ensure that it is accurate in all material respects and up to date. Any amendments to the Protocol must be submitted in writing and signed by a duly appointed representative of Subscriber;

7.1.4 be responsible (at its own cost) for preparing and maintaining the Monitored Property for the supply of the Services, including identifying, monitoring, removing and disposing of any hazardous materials from the Monitored Property in accordance with all applicable laws, before and during the supply of the Services at those premises;

7.1.5 inform Company of all health and safety rules and regulations and any other reasonable security requirements that apply at the Monitored Property;

7.1.6 obtain and maintain all necessary licenses and consents and comply with all relevant regulations in relation to the Services, and produce a copy of same within seven (7) days of being requested to do so by Company;

7.1.7 keep the Equipment in good condition, and not dispose of, repair or use the Equipment other than in accordance with Company's written instructions or authorization;

7.1.8 give Company thirty (30) days' prior notice of any proposed structural alterations to the Monitored Property and of any required modifications to the Netwatch System or changes to the Communications Path which may affect the Services;

7.1.9 give Company sixty (60) days' prior notice where Subscriber has entered into negotiations which may result in the ownership or occupancy of the Monitored Property changing;

7.1.10 notify Company by telephone, and if requested, confirm same in writing if an Alarm Condition occurs accidentally or inadvertently;

7.1.11 ensure that it makes available such components of the Communications Path as may be necessary for the operation of the Services, and shall further ensure that the cost of the Communications Path together with all charges for the continued use thereof, are punctually paid to the appropriate service provider or other authority as the case may be to enable Company to carry out the Services;

7.1.12 immediately notify both Company and the Police Department in the relevant jurisdiction of any loss or theft of the Equipment;

7.1.13 if only part of Subscriber's premises is covered by the Netwatch System, review the part of the Monitored Property that is monitored regularly and inform Company if any extension of the Services is required to cover additional parts of the Monitored Property;

7.1.14 provide to Company signed approval of the incorporated Schedules prior to the relevant date for each.
   a. Scope of Work, Schedule of Equipment, Site Design, and AutoPay Enrollment Form approved prior to scheduling of an Installation Date.
   b. Site Protocol approved prior to Commencement Date.
   c. When significant amendments are made to the Netwatch System during the Term, revised confirmation by the Subscriber may be required in writing.

7.2 If Subscriber experiences problems in the rendering of Services, Subscriber shall notify Company immediately or not less than two (2) days from the date of the event giving rise to the issue and Subscriber shall then afford Company a reasonable opportunity to examine the Netwatch System and Communications Path in order to remedy said difficulty as soon as reasonably possible.

7.3 If Company's performance of its obligations under the Agreement is prevented or delayed by any act or omission of Subscriber, its agents, subcontractors, consultants or employees, Company shall not be liable for any costs, charges or losses sustained or incurred by Subscriber arising directly or indirectly from such prevention or delay.

7.4 Subscriber shall be liable to Company, on demand, for all reasonable costs, charges or losses sustained or incurred by Company (including, without limitation, any direct, indirect or consequential losses, loss of profit, loss of reputation, loss or damage to property and those arising from injury to or death of any person and loss of opportunity to deploy resources elsewhere) arising directly or indirectly from Subscriber's fraud, negligence, failure to perform or delay in the performance of any of its obligations under the Agreement, subject to Company confirming such costs, charges and losses to Subscriber in writing.

7.5 Subscriber hereby agrees to maintain insurance coverage for the Monitored Property.

7.6 Subscriber fully understands that the installation of the Netwatch System is **NOT** a substitute for insuring the Monitored Property nor should it affect the level of insurance required.

8. Equipment

8.1 Subscriber shall be afforded a reasonable opportunity to inspect the Equipment, which is deemed to be in good working order, and wholly free from damage. In the event that any issues with the Equipment are noted these should be raised prior to the Commencement Date so that appropriate action may be taken by Company if required.

8.2 The Equipment shall be held by Subscriber in safe custody at Subscriber's own risk and maintained and kept in good condition by Subscriber until returned to Company, and shall not be disposed of or used other than in accordance with Company's strict written instructions or authorization.

8.3 For the duration of the Agreement, Subscriber shall:

8.3.1 hold the Equipment on a fiduciary basis as Company's bailee and not commingle the Equipment with any other goods belonging to Subscriber or third parties, to mark them as Company's property and to allow Company access to premises to verify that this has been done;

8.3.2 not remove, deface or obscure any identifying mark or packaging on or relating to the Equipment;

8.3.3 not annex the Equipment to Company's premises without the consent of Company;

8.3.4 allow Company access to the Equipment at all reasonable times for the purpose of inspection, maintenance replacement or repossession if this is necessary; and

8.3.5 maintain Equipment in satisfactory condition and keep it insured on Company's behalf for its full price against all risks with an appropriate insurer. Subscriber shall use its reasonable endeavors to obtain an endorsement of Company's interest in the Equipment on its insurance policy. On request Subscriber will allow Company to inspect the insurance policy.

9. Liability of Company

9.1 In no event will Company's aggregate or cumulative liability arising out of or related to this Agreement exceed the fees actually paid to Company during the term of this Agreement.

9.2 Company shall have no liability arising out of or in connection with any incidents involving the failure of the Monitoring Service to respond to an Alarm Condition where such failure is caused by the operation, non-operation, or faulty operation of the Alarm System, whether or not on the part of Subscriber or employees or agents of Subscriber.

9.3 Company shall not be liable to Subscriber for any loss arising to Subscriber out of the improper or unauthorized use of Equipment or the Netwatch System or the temporary unavailability of Communications Path or for any other reason which is beyond the reasonable control of Company including but not limited to the occurrence of a force majeure event (within the meaning of clause 14 herein) at Monitored Property, Communication Hub or Emergency Services.

9.4 Company shall have no liability arising out of any incidents involving a failure, delay or refusal to respond to an Alarm Condition on the part of any Emergency Services, or any other party.

9.5 Company shall have no liability for any loss, damage or expense arising out of the failure on the part of the Subscriber to make satisfactory arrangements for the provision of an alternative monitoring service in the event of termination of this Agreement.

9.6 Notwithstanding any other provision of this Agreement;

9.6.1 Subscriber shall mitigate damages that would otherwise be recoverable from Company pursuant to this Agreement by taking all reasonable actions to reduce the amount of such damages, and

9.6.2 no claim that arises out of an event that occurred more than one (1) year prior to the filing of such claim may be asserted by Subscriber

9.7 Except as expressly set forth herein, Company makes no warranties of any kind with respect to any service, whether oral or written, express or implied, including, without limitation, and warranty of merchantability, warranty by usage of trade or course of dealing or warranty that any service or equipment

9.7.1 will be fit for a particular purpose;

9.7.2 will continue to operate or be offered in current form;

9.7.3 will be accessible or operational without interruption;

9.7.4 will meet the requirements or expectations of the subscriber; or

9.7.5 will be free from errors, defects, or design flaws.

9.8 Company shall not be liable for:

9.8.1 loss of profits; or

9.8.2 loss of business; or

- 9.8.3 depletion of goodwill and/or similar losses; or
- 9.8.4 loss of anticipated savings; or
- 9.8.5 loss of goods; or
- 9.8.6 loss of contract; or
- 9.8.7 loss of use; or
- 9.8.8 loss or corruption of data or information; or
- 9.8.9 any special, indirect, consequential or pure economic loss, costs, damages, charges or expenses.
- 9.9 Company's total liability in contract, tort (including negligence or breach of statutory duty), misrepresentation, restitution or otherwise arising in connection with the performance, or contemplated performance, of this Agreement shall be limited to not more than the Fees paid for the Services to date.

10. Indemnity
    - 10.1 In the event that the Emergency Services are called in circumstances where it is due to a fault on the part of Subscriber then Subscriber shall indemnify Company fully against any cost or loss that Company many incur in that instance.
    - 10.2 Subscriber shall indemnify Company fully against all costs, claims, actions, proceedings, demands, losses, awards, penalties, fines, liabilities or expense of whatsoever nature incurred or suffered by Company arising out of any action brought by a third party as a result of loss or damage to property or equipment held at the Monitored Property from time to time.

11. Data Protection
    - 11.1 The Services may involve the capturing of a person's image. Written notice that CCTV is in operation will therefore be placed at the Monitored Property with a contact number to discuss this processing. Images captured by Company will be held for no longer than one (1) month unless the images captured identify an issue such as a break in or theft and is retained in the context of an investigation. Company will store the data in a secure environment with a log of access kept and access shall be restricted to authorized personnel. Company confirms that it complies with its obligations under the Data Protection Legislation.
    - 11.2 Subscriber hereby consents to Company processing, both electronically and manually, the data it collects in relation to the Services including any captured images on CCTV, for the purposes of carrying out the Services in an efficient manner and for compliance with applicable procedures, laws and regulations and to the transfer, storage and processing by Company or its agent of such data outside the United States of America, the European Economic area, and any other country in which Company operates or has offices.
    - 11.3 Telephone calls between Company and Subscriber may be recorded. This is for quality control and security purposes. This condition constitutes notice to Subscriber that calls are recorded in this manner and for this purpose and no further notice will be given to Subscriber. Company shall comply with its obligations under all state and Federal regulations in respect to all telephone recordings.

12. Termination
    - 12.1 Without limiting its other rights or remedies, subject to this clause 12, each party shall have the right to terminate the Agreement by giving the other party sixty (60) days' written notice.
    - 12.2 Without prejudice to any other rights or remedies which Company may have, Company may terminate the Agreement immediately on giving written notice to Subscriber if:
        - 12.2.1 Subscriber fails to pay any amount due under the Agreement on the due date for payment and remains in default not less than thirty (30) days after being notified in writing to make such payment; or
        - 12.2.2 Subscriber commits a breach of any of the terms of the Agreement and (if such a breach is remediable) fails to remedy that breach within thirty (30) days of that party being notified in writing of the breach; or
        - 12.2.3 the Emergency Services or any of them refuse to respond to an Alarm Condition, or withhold or otherwise withdraw their service in respect of the Monitored Property; or
        - 12.2.4 if at any time, the Communication Hub or the Receiving Equipment are destroyed or damaged so that they cannot reasonably be used, or if Company is unable to secure or retain the components of the Communications Path required for the receipt of signals from the Monitored Property; or
        - 12.2.5 if Subscriber refuses or fails to provide adequate Protocol; or
        - 12.2.6 if Subscriber suspends, ceases, or threatens to suspend or cease, any or all of its ongoing business activities.
    - 12.3 Without limiting its other rights or remedies, each party may terminate the Agreement with immediate effect by giving written notice to the other party if:
        - 12.3.1 the other party suspends, or threatens to suspend, payment of its debts or is unable to pay its debts; or admits inability to pay its debts; or
        - 12.3.2 the other party commences negotiations with all or any class of its creditors with a view to restructuring any of its debts, or makes a proposal for or enters into any compromise or arrangement with its creditors; or
        - 12.3.3 a petition is filed, a notice is given, a resolution is passed, or an order is made, for or in connection with the winding up of that other party; or
        - 12.3.4 a person becomes entitled to appoint a receiver over the assets of the other party or a receiver is appointed over the assets of the other party.
    - 12.4 On termination of the Agreement for any reason Subscriber shall do the following:
        - 12.4.1 immediately pay to Company the outstanding Fees and interest due thereon (if applicable) and, in respect of Services supplied but for which no invoice has been submitted, Company may submit an invoice, which shall be payable immediately on receipt. The amount due and owing by Subscriber upon termination shall be 100% of the balance of Daily Managed Service Fees remaining in the Managed Service Agreement.
        - 12.4.2 provide prompt access to the Monitored Property for the removal of the Equipment. If Subscriber fails to do so, then Company may enter Subscriber's premises and take possession of the Equipment. Until the Equipment has been returned or repossessed, Subscriber shall be solely responsible for its safekeeping. If the Equipment is not returned or is beyond reasonable economic repair at the end of the Term, Subscriber shall pay Company a sum equal to the current manufacturer's suggested retail price for each unreturnable item;
        - 12.4.3 provide written communication to info@netwatchsystem.com that monitoring is to cease immediately or at a specified date; and
        - 12.4.4 provide written notification to satisfy Clause 12.1 of this Agreement to usahq@netwatchsystem.com to ensure that measures to close the Subscribers account are initiated.
    - 12.5 The accrued rights and liabilities of the parties at time of termination and the continuation of any provision expressly stated to survive or implicitly surviving termination, shall not be affected.

13. Notice
    - 13.1 Any notice or direction to be served by either party on the other shall, unless otherwise stated, be sufficiently served if e-mailed, delivered by hand and/or sent by pre-paid certified mail to the last known address of the party to be served, and any such notice shall be deemed to have been served at the time of delivery or three (3) business days after the time of mailing as the case may be and for the purposes of this clause the term "Business Day" shall mean any day upon which the Federal Courts are open for business.

14. Force Majeure
    - 14.1 Company shall have no liability to Subscriber under the Agreement if it is prevented from or delayed in performing its obligations under the Agreement or from carrying on its business by acts, events, omissions or accidents beyond its reasonable control, including (without limitation) strikes, lock-outs or other industrial dispute (whether involving the workforce of Company or any other party), failure of a utility service or transport network, act of God, war, riot, civil commotion, malicious damage, compliance with any law or governmental order, rule, regulation or direction, accident, breakdown of plant or machinery, fire, flood, storm or default of suppliers or subcontractors.

15. General
    - 15.1 This Agreement constitutes the entire agreement and understanding between the parties in relation to its subject matter and supersedes any prior agreement either verbal or written made between the parties.
    - 15.2 Any variation to this Agreement shall only be valid and binding if it is recorded in writing and signed by an active and duly authorized Manager of Company.
    - 15.3 This Agreement constitutes the entire agreement between the parties and supersedes all previous agreements between the parties. Each party acknowledges that in entering into this Agreement, it has not relied on and shall have no right or remedy in respect of any statement, representation, assurances or warranty except as expressly provided in the Agreement.
    - 15.4 Company may assign or transfer the benefit of this Agreement or all or any of its rights or obligations hereunder to any person or persons. Subscriber shall not assign or transfer to any person or persons the benefit of this Agreement or all or any of its rights or obligations hereunder without the prior written consent of Company, which consent shall not be unreasonably withheld.
    - 15.5 This Agreement shall be signed by a duly authorized representative of Subscriber and Company shall be entitled to treat Subscriber as contractually bound by these terms and conditions unless Subscriber demonstrates that no reasonable grounds existed for Company to believe that such person had authority to bind Subscriber.
    - 15.6 If any provision of this Agreement shall be found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement which shall remain in full force and effect.
    - 15.7 If any provision of this Agreement is so found to be invalid or unenforceable but would be valid or enforceable if some part of the provision were deleted or amended, the provision in question shall apply with such modification(s) as may be necessary to make it valid and enforceable.
    - 15.8 This Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts, without application of its conflicts of laws or principles, and the parties agree to submit to the exclusive jurisdiction of the Courts, herein; except as stated in Clause 15.9.
    - 15.9 Prior to the commencing of any legal proceeding in reference to this Agreement, Subscriber agrees to first participate in non-binding arbitration in accordance with the presently adopted rules governing said procedure as adopted by the American Arbitration Association®.
    - 15.10 In the event that Subscriber initiates any legal proceeding, in contravention of Clause 15.9, Subscriber agrees without objection to stay that proceeding until such time as non-binding arbitration can be rendered by an approved arbitrator or panel of the authorized American Arbitration Association®.