Date Filed 4/17/2023 6:26 PM
Superior Court - Worcester
Docket Number



**Exhibit 4**



## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.

SUPERIOR COURT
DEPARTMENT OF
THE TRIAL COURT

|  |  |
|---|---|
| RYAN CONSALVO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROYAL SUN FARM LLC | ) |
| and DAMON SCHMIDT, | ) |
| | ) |
| Defendants. | ) |
| | ) |

C. A. No. 2385CV400-D

## COMPLAINT

Plaintiff Ryan Consalvo brings this action against his former employer, Royal Sun Farm LLC, and its manager, Damon Schmidt, for the failure to timely pay wages, including paid time off and bonuses, in violation of state law.

### PARTIES

1.      Plaintiff Ryan Consalvo resides in Templeton, Massachusetts.

2.      Royal Sun Farm LLC ("Royal") is a domestic limited liability company with a usual place of business located at 69 Gardner Road, Hubbardston, Massachusetts 01452.

3.      At all relevant times, Defendant Damon Schmidt has served as manager of Royal and, on information and belief, has controlled, directed, and participated to a substantial degree in formulating and determining the policies of the company.

4.      Defendant Damon Schmidt set Plaintiff's rate of pay, controlled Royal's payroll – including whether, when, and in what amount Plaintiff was compensated – and set all major policies at Royal.

1

5.    On information and belief, Defendant Damon Schmidt resides at 130 South Royalston Road, Royalston, MA 01369.

6.    The Defendants employed the Plaintiff.

## **JURISDICTION**

7.    This court has jurisdiction to address this matter pursuant to, *inter alia*, M.G.L. c. 149, § 150 and its inherent common law authority.

8.    The Plaintiff has filed a complaint regarding this matter with the Massachusetts Attorney General pursuant to M.G.L. c. 149, § 150.

9.    Venue is proper pursuant to M.G.L. c. 223 § 2 because Defendant resides in Middlesex County.

## **FACTS**

10.    Royal is a cannabis growing company with locations in Hubbardston, Massachusetts and Royalston, Massachusetts.

11.    On or around February 8, 2022, Royal hired Plaintiff Ryan Consalvo to work as a Director of Cultivation.

12.    Royal agreed to compensate Mr. Consalvo with a base salary of $100,000.00 per year plus bonuses, as outlined below.

13.    Royal also agreed to provide Mr. Consalvo with two weeks of paid time off (PTO) per year.

### ***Bonus Structure***

14.    Royal agreed to compensate Mr. Consalvo pursuant to an offer letter dated January 30, 2022 (the "Offer Letter"). A true and accurate copy of the Offer Letter is attached as <u>Exhibit A</u>.

Date Filed 4/17/2023 6:26 PM
Superior Court - Worcester
Docket Number

15.     Pursuant to the Offer Letter, Royal agreed to pay Mr. Consalvo harvest-related bonuses as follows:

      a.  $25,000 four (4) weeks after Hubbardston's first harvest, estimated to occur at the end of July 2022;

      b.  $25,000 two (2) weeks after Hubbardston's second harvest, estimated to occur in September or October 2022; and

      c.  $25,000 four (4) weeks after Royalston's first harvest, estimated to occur in Fall 2022.

16.     In order to count for a bonus, Royal required that the majority of each harvest pass Massachusetts testing requirements and be sellable.

### *Unpaid Harvest Bonuses*

17.     The Hubbardston location completed its first harvest in July/August 2022.

18.     On information and belief, this harvest passed Massachusetts testing requirements and was sellable.

19.     Per the Offer Letter, Mr. Consalvo earned a $25,000.00 bonus for the July/August 2022 Hubbardston harvest.

20.     Pursuant to the Offer Letter, Mr. Consalvo's first harvest bonus was to be paid out no later than four weeks after the harvest.

21.     However, Royal failed to pay Mr. Consalvo his bonus for the July/August 2022 Hubbardston harvest within six days of the pay period in which it was earned, or four weeks after the harvest.

22.     Following the Hubbardston location's first harvest, Mr. Consalvo helped complete all planting and other work necessary to prepare the location for its second harvest.

23.     On information and belief, the Hubbardston location's second harvest was completed in October or November 2022.

24.     On information and belief, this harvest passed Massachusetts testing requirements and was sellable.

25.     Per the Offer Letter, Mr. Consalvo earned a $25,000.00 bonus for the second Hubbardston harvest.

26.     Pursuant to the Offer Letter, Mr. Consalvo's second harvest bonus was to be paid out no later than the two weeks after the harvest was completed.

27.     However, Royal failed to pay Mr. Consalvo for his second harvest bonus for the second Hubbardston harvest within six days of the pay period in which it was earned, within two weeks after the harvest was completed, or at any point thereafter.

28.     On or around October 2, 2022, Royal made one $4,500.00 payments towards Mr. Consalvo's first bonus.

29.     To date, Royal owes Mr. Consalvo $45,500 in bonuses.

### *Unpaid PTO*

30.     Royal terminated Mr. Consalvo's employment by phone on October 2, 2022.

31.     M.G.L. c. 149, § 148 requires employers to pay terminated employees all earned wages, including PTO and other accrued benefits, on the date of the employee's termination.

32.     As of the date of Mr. Consalvo's termination, he had accrued and not used two weeks of PTO, the equivalent of $3,846.15.

33.     Royal failed to pay Mr. Consalvo any portion of his accrued unused PTO on the date of his termination or at any point thereafter.

34.     As of the date of this filing, Royal owes Mr. Consalvo,  $3,846.15 in accrued unused

PTO.

## CAUSES OF ACTION

35.     For all counts that follow, the Plaintiff hereby realleges and incorporates by reference the

facts and allegations contained in the preceding paragraphs of this pleading as if fully set forth

herein.

## COUNT I

## NON-PAYMENT OF EARNED WAGES IN VIOLATION OF M.G.L. c. 149, §§ 148, 150

36.     M.G.L. c. 149, § 148 mandates the timely payment of all earned wages.

37.     Section 148 provides in relevant part:

> Every person having employees in his service shall pay weekly or
> bi-weekly each such employee the wages earned by him to within
> six days of the termination of the pay period during which the
> wages were earned …and any employee discharged from such
> employment shall be paid in full on the date of his discharge[.]
>
> M.G.L. c. 149, § 148.

38.     M.G.L. c. 149, § 148 further provides:

> The word "wage" shall include any holiday or vacation payments
> due an employee under oral or written agreement.

39.     By failing to timely pay the Plaintiff the full amount of his earned wages, including

earned bonuses and accrued, unused PTO, when the same became due and payable, the

Defendants violated the Weekly Payment of Wages Act, M.G.L. c. 149, § 148.

40.     The Defendants' failure to comply with M.G.L. c. 149, § 148 entitles the Plaintiff to

recover treble damages, interest, reasonable attorneys' fees, and costs pursuant to M.G.L. c. 149,

§ 150.

## COUNT II

### BREACH OF CONTRACT
### (Against Royal Only)

41.    The Plaintiff and the Defendant were parties to a contract under which the Defendant

agreed to and had a duty to pay the Plaintiff wages, including bonuses.

42.    The Defendant breached its contractual duty by failing to pay Plaintiff the wages due

pursuant to the terms of the contract.

43.    The Defendant's breach was material.

44.    As a result of the Defendant's breach, the Plaintiff suffered damages.

45.    The Defendant's breach was both the proximate and actual cause of Plaintiff's damages.

46.    The Defendant's breach of contract entitles Plaintiff to recover contract damages,

including but not limited to, incidental and consequential damages, and pre-judgment interest

from the date of the breach.

## COUNT III

### UNJUST ENRICHMENT
### (Against Royal Only)

47.    The Defendant received the benefit of Plaintiff's time, work, and professional skill

without compensating him for the same and as Plaintiff legitimately expected.

48.    The Defendant was unjustly and unfairly enriched by the amount of the unpaid wages, as

well as any profits it has made as a result of the Plaintiff's work.

49.    The Defendant benefited financially from its failure to pay the Plaintiff commissions and,

as a result, the Plaintiff suffered damages.

WHEREFORE, the Plaintiff requests that the Court enter final judgment against the

Defendants, awarding the Plaintiff:

6

1. Treble damages, interest, reasonable attorney's fees, and costs pursuant to M.G.L. c. 149, § 150 for the failure to timely pay earned wages;

2. Contract damages and pre-judgment interest for breach of contract;

3. Equitable damages for unjust enrichment; and

4. Such other relief that the Court deems just.

## JURY DEMAND

THE PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL CLAIMS SO TRIABLE.

Respectfully submitted,

RYAN CONSALVO,
by his attorneys,

*/s/ Raven Moeslinger*

Raven Moeslinger (BBO No. 687956)
Nicholas F. Ortiz (BBO No. 655135)
Law Office of Nicholas F. Ortiz, P.C.
50 Congress Street, Suite 520
Boston, MA 02109
(617) 338-9400
rm@mass-legal.com

Dated: April 18, 2023

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number



E-FILED

## COMMONWEALTH OF MASSACHUSETTS

WORCESTER, ss.                                    SUPERIOR COURT DEPARTMENT
                                                       OF THE TRIAL COURT

| | |
|---|---|
| MICHAEL POLACCO, <br> TRUSTEE OF BAILEY REAL ESTATE TRUST )<br>  )<br> Plaintiff,   )<br>  )<br> v.   )<br>  )<br> DAMON SCHMIDT and   )<br> ROYAL SUN FARM, LLC   )<br>  )<br> Defendants,   ) | C.A. NO. 2385CV00909 |

**VERIFIED COMPLAINT**

1.     This action is brought by Michael Polacco, Trustee of Bailey Real Estate Trust

("Bailey Trust") to recover amounts due and owing under a farm lease between Bailey Trust, as

Landlord, and Damon Schmidt ("Schmidt") and Royal Sun Farm, LLC, a Massachusetts limited

liability company ("Royal Sun") (collectively, the "Defendants"), which Schmidt and Royal Sun

have failed and refused to pay.

**PARTIES**

2.     Landlord is a trust established under an instrument of trust dated February 10,

2020 recorded with the Worcester County Registry of Deeds at Book 61879, Page 275.

3.     Royal Sun is a corporation organized under the laws of Massachusetts with a

principal place of business at 69 Gardner Road, Hubbardston, Worcester County, Massachusetts

01452.

4.     Schmidt is an individual, and Royal Sun's co-tenant under a farm lease with

Landlord, and he is the registered agent of Royal Sun.

000000\4578376

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

5.      Schmidt resides at 160 South Royalston Rd., Royalston, MA 01368.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to M.G.L. c. 212, § 4.

7.      This Court possesses personal jurisdiction over Royal Sun pursuant to M.G.L. c. 223A, § 2 because it is organized under the laws of the Commonwealth of Massachusetts and it has a principal place of business within the Commonwealth of Massachusetts.

8.      This Court possesses personal jurisdiction over Schmidt pursuant to M.G.L. c. 223A, § 2 because he is domiciled in the Commonwealth of Massachusetts.

9.      Venue is appropriate in Worcester County Superior Court because Royal Sun's principal place of business is located in Worcester County, Schmidt works and resides in Worcester County, and the leased property at issue is located in Worcester County.

10.     The amount in controversy exceeds the sum or value of twenty-five thousand dollars ($25,000), exclusive of interest and costs.

## FACTUAL BACKGROUND

11.     The Landlord owns the property located at 69 Gardner Road, Hubbardston, Massachusetts (the "Property").

12.     The Landlord, on the one hand, and Royal Sun and Schmidt, on the other hand, entered into a Farm Lease dated April 21, 2021(the "Lease").

13.     Schmidt, as Manager of Royal Sun, executed the Lease on behalf of Royal Sun and in his individual capacity.

14.     A true and accurate copy of the Lease is attached as Exhibit A.

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

15.     Pursuant to the Lease, Royal Sun and Schmidt, as lessees, were permitted to use the Property for the cultivation of a lawful cannabis crop (the "Cannabis Crop") thereon under a license issued by the Massachusetts Cannabis Control Commission.

16.     In exchange for its use of the Property, Royal Sun and Schmidt are required to pay the Landlord rent, which is due in equal monthly installments.

17.     Based on the terms of the Lease, the monthly rent owed by the Defendants $10,000.00 per month beginning on April 1, 2021, which was due, in-full, on March 31, 2022.

18.     Thereafter, Defendants were required to make monthly payments to Landlord in the amount of $10,000.00 per month beginning on April 1, 2022 and continuing through the present.

19.     As of August 1, 2023 the total rent owed by the Defendants, inclusive of contractually allowable interest, was $307,000.00.

20.     To date, Defendants have not made any payments under the Lease.

21.     The failure to timely remit rent payments to Landlord is a default under Section 17.1 of the Lease, permitting Landlord to, among other options, terminate the Lease after giving this Notice of Default if the Defendants' default is not cured within thirty (30) days from the giving of this Notice.

22.     On or about June 7, 2023, the Landlord sent Defendants a Notice of Default informing them that they were in default under the terms of the Lease because they failed to pay the entire rent owed for the time period running from April 1, 2021 through May 31, 2023. A true and accurate copy of the Notice of Default is attached as Exhibit B.

23.     This Notice of Default demanded that Defendants cure the default within thirty (30) days.

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

24.     Neither Royal Sun nor Schmidt cured this breach of the Lease by paying the arrearage.

25.     Upon information and belief, Royal Sun and Schmidt has possessed sufficient funds to cure its breach of the Lease, but it has willfully and intentionally refused to pay its outstanding rent balance.

**COUNT I**

**(Breach of Contract Against Royal Sun and Schmidt)**

26.     Landlord repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

27.     The Lease is a binding contract between Royal Sun, Schmidt, and Landlord.

28.     Landlord timely performed all of its obligations under the Lease.

29.     Royal Sun breached the Lease by failing to pay the rent due and owing.

30.     Schmidt breached the Lease by failing to pay the rent due and owing.

31.     Royal Sun and Schmidt have failed to cure the breaches as required by the Lease.

32.     As a result of Royal Sun's and Schmidt's breaches of the Lease, Landlord has suffered harm in an amount to be determined at trial, but in no event less than the $307,000.00, which is currently due and owing under the Lease for unpaid rent, plus interest and attorney's fees.

**COUNT II**

**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against Royal Sun and Schmidt)**

33.     Landlord repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

34.     The Lease is a binding contract between Royal Sun, Schmidt, and Landlord, which is subject to an implied covenant of good faith and fair dealing, requiring that the parties

4

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

remain faithful to the intended and agreed upon expectations of the parties, and to refrain from the improper conduct as alleged in this Verified Complaint.

35.     Through the activities described above, Royal Sun and Schmidt have intentionally deprived Landlord of the benefits of the Lease.

36.     Royal Sun's and Schmidt's conduct described herein constitutes a breach of the covenant of good faith and fair dealing implied as a matter of law in the Lease.

37.     As a result of Royal Sun and Schmidt's breaches, Landlord has suffered damages in an amount to be determined at trial, plus interest and attorney's fees.

## COUNT III
### (Preliminary Injunction)

38.     Landlord repeats and incorporates by reference all preceding paragraphs as if fully set forth herein.

39.     Royal Sun and Schmidt currently owe Landlord no less than $307,000.00 under the terms of the Lease.

40.     Landlord has a likelihood of success on the merits of its claims because the Lease is a valid and binding contract, and Royal Sun and Schmidt cannot dispute the amount of rent due and owing under the Lease or their failure to pay as required under the Lease.

41.     Landlord is not aware of any liability insurance available to satisfy its claims.

42.     Landlord is at risk of suffering irreparable harm by being left with an uncollectable monetary judgment if Landlord is not granted prejudgment security in the form of a preliminary injunction enjoining the Defendants from selling, alienating, transferring and/or otherwise disposing of any asset held and/or controlled by Schmidt and/or Royal Sun, other than in the ordinary course of business, including, but not limited to, the Cannabis Crop located in, around, and/or on the Property.

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

## **PRAYERS FOR RELIEF**

WHEREFORE, Landlord respectfully requests that this Court:

(a)     Enter judgment for Landlord on all counts;

(b)     Award Landlord monetary damages in an amount to be proven at trial;

(c)     Issue a Preliminary Injunction enjoining Defendants from selling, alienating,

transferring and/or otherwise disposing of any asset held and/or controlled by

Schmidt and/or Royal Sun, other than in the ordinary course of business,

including, but not limited to, the Cannabis Crop located in, around, and/or on the

Property;

(d)     Award Landlord its costs, interest and attorney's fees incurred in connection with

this action; and

(e)     Award such other and further relief as the Court deems just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE.**

Respectfully submitted,

MICHAEL POLACCO, TRUSTEE OF BAILEY
REAL ESTATE TRUST

By his attorneys,

Michael P. Ross (BBO No. 668928)
Robert M. Schlein (BBO No. 445785)
Kenneth A. Sherman (BBO No. 569293)
PRINCE LOBEL TYE LLP
One International Place, Suite 3700
Boston, MA  02110
Tel: (617) 456-8000
Fax: (617) 456-8100
mross@princelobel.com
rschlein@princelobel.com
ksherman@princelobel.com

Date: August 21, 2023

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

## VERIFICATION

I, Michael Polacco, Trustee of Bailey Real Estate Trust, verify that I have read the above Verified Complaint and that the facts set forth therein are true and accurate based on my personal knowledge, except for those allegations based on information and belief, and, as to those allegations, I am informed and believe them to be true.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 20th DAY OF AUGUST, 2023.

_____
Michael Polacco

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

# EXHIBIT A

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

# FARM LEASE

THIS LEASE is entered into this 1st day of April, 2021, by and between Michael Polacco, Trustee of Bailey Real Estate Trust (Landlord) and Royal Sun Farm LLC and Damon Schmidt (Tenant).

1. **Demise and Property.** The Landlord leases to the Tenant, to occupy and use for agricultural, and related purposes, certain vacant real property (the "Property"), located in Worcester County, Massachusetts, and more particularly described as:

    1.1 **Description.** Property at 69 Gardner Road, Hubbardston, Massachusetts containing approximately 19.36 **acres and** more particularly described in deed recorded in the Worcester County Register of Deeds at **Book 61879, Page 269.**

2. **Term.** The initial term of this Lease shall run for a period of one (1) year, to commence on April 1, 2021 and terminate on March 30, 2022. Tenant may not record a Memorandum of Lease with the Register of Deeds;

3. **Rent.** **Rate.** Tenant agrees and covenants to pay to Landlord or to such other persons or entities as Landlord may from time to time designate in writing, fixed rent of **$ 10,000.00 per month, to accrue and be due and payable in full on March 30, 2022, without offset or deduction.** In the event Tenant fails to pay rent within five days of when due, the Tenant shall pay to Landlord a late charge equal to 10% of the amount due to compensate Landlord for the extra costs incurred as a result of such late payment.

4. **Purpose.** The Property is to be used by Tenant for agriculture, or related purposes, specifically the cultivation and harvesting of cannabis.

    4.1 **Use of Land.** Landlord permits, authorizes, and consents to Tenant undertaking all activities incident to the foregoing agricultural uses of the Premises.

    4.2 **Prohibited Uses.** Tenant may not, without the prior written consent of Landlord, engage in any of the following activities on said parcels:

    Add fencing, houses, coops or other structures or fencing. The specific location of any proposed structure must be approved by Landlord.

    Any prohibited use can be permitted with the written consent of the Landlord. Landlord may approve, disapprove, require more information, or require certain modifications to

1

the proposed improvement. Tenant's final written proposal including a clear indication of Landlord's consent and signed by Landlord constitutes written consent of Landlord.

**5. Covenants.**

5.1 **Landlord Covenants.** The Landlord covenants with the Tenant:

To allow the Tenant full use of the Lands that comprise the Leased Premises beginning on the Commencement Date and ending on the Termination Date;

5.2 **Tenant Covenants.** The Tenant covenants with the Landlord:

To pay all amounts payable by the Tenant to the Landlord under this Lease (collectively the "Rent");

To use the Leased Premises only for the permitted purposes listed above or any permitted purpose that Landlord later gives written permission to do;

To comply with present and future laws, regulations and orders relating to the occupation and use of the Leased Premises;

To permit the Landlord to enter the Leased Premises at any time outside normal business hours in case of an emergency and otherwise during normal business hours where such will not unreasonably disturb or interfere with the Tenant's use of the Leased Premises or operation of its business, to examine or inspect the Lands;

To be respectful of the Landlord's property and business that take place on the surrounding property, to include but not limited to, people, buildings, equipment, livestock, and fixtures;

To not limit in any way, access to the Water Source by other parties to include the Landlord and guests;

**6. Best Management Practices.** Tenant agrees to employ standard best management practices.

Tenant agrees to comply with all federal, state, and local laws, regulations, ordinances, decrees, and rulings in connection with the use of the premises and any agricultural or other activities conducted thereon, including but not limited to any and all regulations, directives, and procedures necessary to ensure that Landlord continues to qualify for Current Use status under the State's tax code.

7. **Improvement of the Premises.**

   7.1 **Landlord Improvements.** Landlord may build improvements with the consent of the Tenant.

   7.2 **Tenant Improvements.** The Tenant may at its expense make improvements, additions or alterations to the Property throughout the term of this Lease with the written consent of the Landlord.

   7.3 The Tenant may from time to time at its own expense make changes, additions and improvements to the Leased Premises to better adapt the same to its business, provided that any change, addition or improvement shall be carried out in a good and workmanlike manner and the Tenant shall not incur any debt during the course of work or for materials that could result in a lien or encumbrance on the Landlord's interest in the property. Such Alterations must be approved in writing by Landlord.

   7.4 **Removal of Improvements by Tenant.** Improvements made under this Section 7 whether or not capable of severance shall become the property of Landlord at termination of the lease without compensation to the Tenant.

8. **Taxes.** Landlord shall be responsible for real estate taxes on the Property.

9. **Utilities.** Tenant will pay all charges for electricity and any other utility service allocated to agricultural or equestrian use by agreement with the Landlord.

   9.1 **Utilities contracts.** Tenant has the option to place utility contracts in its name, and if so will have the right to any surplus power income.

   9.2 **Energy Tax Credits.** Landlord specifically reserves the right to claim any tax credits related to installation of energy facilities on the premises.

   9.3 **Equipment, Fixtures, and Signs.** All furnishings, fixtures, equipment, and signs used on the Property, which have been supplied to or installed by the Landlord, shall be the property of Landlord. A partial list of fixtures retained by the Landlord is attached as Attachment A. Installed items belonging to Tenant are included as Attachment B.

10. **Care and surrender of the Premises.** Tenant shall commit no waste on the Premises. Upon any termination of this Lease, Tenant shall surrender possession of the Premises, without notice, in as good condition as at the commencement of the term, reasonable wear and tear and casualty beyond the Tenant's control being excepted. Tenant shall be responsible for any environmental clean-up required by the proper authorities, which contamination resulted from Tenant's activities.

11. **Entry by Landlord.** Landlord, Landlord's agents and representatives may, at any reasonable time and at least once each year, enter the Property for the purpose of inspecting and repairing building and grounds; provided, however, that, in so doing, Landlord, Landlord's agents or representatives will endeavor to avoid interfering with the use and occupancy of the Property by Tenant.

12. **Indemnity.** Tenant shall indemnify Landlord against, and hold Landlord harmless from, all claims, demands, and/or causes of action, including all reasonable expenses of Landlord incident to such proceedings, for injury to, or death of any person, or loss of, or damage to, any property, where such claims, demands, and/or causes of action are not caused by the negligence, omission, intentional act or breach of contractual duty of or by Landlord or anyone for whom Landlord is responsible. Tenant's agreement to indemnify Landlord must include, but not be limited to, all claims, demands, and/or causes of action, including all reasonable expenses of Landlord, arising from any hazardous waste generated by Tenant.

13. **Insurance.** Tenant shall obtain and keep in effect general liability insurance against any and all claims for personal injury or property damage occurring in or upon the Premises during the term of the Lease and any extensions.

14. **Fire and Casualty.**

14.1 **Restoration.** In the event the Property is damaged or rendered totally or partially untenable by fire or casualty, Landlord may repair or restore the Property to the condition of the Property prior to such fire or casualty within a reasonable time, not exceeding six (6) months after the date of such fire or casualty, in which event the Lease term shall not terminate.

14.2 **If Untenable and Near End of Term.** Should the Property be so damaged or destroyed as to render the building(s) and/or the house totally or partially untenable and the fire or casualty occurs within a six (6) month period prior to the termination of the initial term of this Lease or any extension, Tenant has the right and option to declare the Lease terminated.

15. **Assignment or subletting.** Tenant does not have the right to assign or sublet this Lease without Landlord's written consent.

16. **Minerals.** Nothing in this Lease confers upon the Tenant the right to minerals underlying the Property.

17. **Default.**

17.1 **Tenant Default.** In the event Tenant fails to pay when due any of the rentals provided for in Section 4 or fails to promptly keep and perform any other covenant in this Lease, Landlord, prior to taking any other action, shall give Tenant written notice specifying the default(s). Tenant shall have thirty (30) days after receipt of said notice to correct any rental default and thirty (30) days to correct any other default(s). If

4

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

Tenant fails to correct the default(s) within the specified time periods, the Landlord may: (a) terminate this Lease and re-enter the Property, with or without process of law, and take possession by reasonable force; or (b) relet the Property at the best rental obtainable, Tenant to remain liable for the deficiency, if any, between the rental received by Landlord on any reletting and the rental provided for in this Lease.

17.2 **Landlord Default.** Should there be any default or breach of this Lease on the part of Landlord, Tenant shall give Landlord notice, and should Landlord fail to correct such breach or default within thirty (30) days after such notice, the Tenant may remedy such breach or default and deduct the reasonable cost, including interest on same, from rentals due or to become due Landlord, or pursue any other legal or equitable remedy to which it is entitled. If Tenant has not been reimbursed for its reasonable cost in remedying Landlord's breach or default at the expiration of the last term of this Lease, or if Landlord is indebted to Tenant because of a breach or default of this Lease at the expiration of the last term, Tenant may, at its option, extend this Lease on the same terms and conditions as provided until such costs and indebtedness are fully paid by application to rent.

17.3 **Diligence to Cure.** If any default occurs, other than in the payment of money, which cannot with due diligence be cured within a period of thirty (30) days, and if the defaulting party commences to eliminate the causes of such default within said thirty (30) day period and proceeds diligently and with reasonable dispatch to take all steps and do all work required to cure such default and does cure the default(s), then the non-defaulting party does not have the right to declare the Lease terminated by reason of such default.

18. **Waiver.** The failure of Landlord or Tenant to insist upon prompt and strict performance of any of the terms, conditions or undertakings of this Lease, or to exercise any option conferred, in any one or more instances, except as to the option to extend or renew the term, shall not be construed as a waiver of the same or any other term, condition, undertaking or option.

19. **Parties Bound.** The terms, covenants, agreements, conditions and undertakings contained in this Lease shall be binding upon and shall inure to the benefit of the heirs, successors in interest and assigns of the parties. Where more than one party shall be the landlord in this Lease, the word "Landlord", whenever used in the Lease, includes all Landlords jointly and severally.

20. **Entire Agreement, Modification, Severability.** This Lease, its Exhibits and any Addenda contain the entire agreement between the parties, and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Lease will alter the covenants, agreements and undertakings set forth. This Lease shall not be modified in any manner, except by an instrument in writing executed by the parties. If any term or provision of this Lease or its application to any person or circumstance is invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, is

5

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

not affected and each term and provision of this Lease is valid and be enforceable to the fullest extent permitted by law.

**21. Liens.** Tenant must keep the Property free from any liens arising from any labor performed by or on behalf of, or materials furnished to, Tenant, or other obligations incident to its use or occupancy. If any lien attaches, and the same is not released by payment, bond or otherwise, within twenty (20) days after Landlord notifies Tenant, Landlord has the option to discharge the same and Tenant shall reimburse Landlord promptly. Nothing contained in this Lease is deemed to deny Tenant the right to contest the validity of any such lien. Nothing in this Lease shall be construed as consent by Landlord to Tenant to make any alteration, improvement or installation or addition so as to give rise to any right to any laborer or material-person to file any mechanic's lien or any notice, or any other lien purporting to affect Landlord's property.

**22. No Partnership Intended.** It is particularly understood and agreed that this Lease is not deemed to be nor intended to give rise to a partnership relationship.

**23. Transfer of Property.** All transfers of the Property are subject to the provisions of this Lease.

**24. Binding on Heirs.** The provisions of this Lease shall be binding upon the heirs, executors, administrators, and successors of both Landlord and Tenant in like manner as upon the original parties, except as provided by mutual written agreement.

**25. Mediation.** Any differences between the parties as to their several rights or obligations under this Agreement not settled by mutual agreement after thorough discussion must be submitted for mediation. The mediator must be knowledgeable of the subject matter of the dispute and shall be agreed upon by the parties. The disputing parties shall share equally the cost of the mediator. If the parties cannot agree upon a mediator or if the dispute cannot be resolved by mediation, the parties may then pursue their claims in a court of law in the Commonwealth of Massachusetts. In any legal or equitable action, the prevailing party shall be entitled to their reasonable attorney's fees and costs.

IN WITNESS WHEREOF, the parties have caused this Lease to be duly executed as of the day and year first above written.

Signed and acknowledged in our presence:

LANDLORDS:

_____
Michael Polacco, Trustee of Hailey Real Estate Trust

9

TENANT: Royal Sun Farm LLC

By: _____

_____
Damon Schmidt, individually

Date Filed 8/21/2023 2:16 PM
Superior Court - Worcester
Docket Number

# EXHIBIT B

# ◤ PRINCE LOBEL

June 7, 2023

**CERTIFIED MAIL, RETURN RECEIPT REQUESTED & E-MAIL**

Damon Schmidt                          Damon Schmidt
Royal Sun Cannabis LLC                 Royal Sun Cannabis LLC
130 South Royalston Rd.                160 South Royalston Rd.
Royalston, MA 01368                    Royalston, MA 01368
(damon@royalsunfarm.com)               (damon@royalsunfarm.com)

### NOTICE OF DEFAULT –
#### 69 Gardner Road, Hubbardston, Massachusetts (the "Property") –

Mr. Schmidt:

Reference is made to the Lease by and between Damon Schmidt, Royal Sun Farm LLC, together, as Tenant, and, our client, Michael Polacco, Trustee of Bailey Real Estate Trust, as Landlord, dated as of April 1, 2021 (the "Lease").

As you are aware, Section 3 of the Lease required Tenant to pay fixed rent in the amount of $10,000.00 per month beginning on April 1, 2021 to Landlord in-full on March 30, 2022 for the prior year, with Tenant required to make monthly payments to Landlord in the amount of $10,000.00, thereafter. As of today's date, Tenant has not paid *any* rent, let alone the contractually mandated amount. To date, Tenant is in arrears on its rent obligation in the amount of $285,000.00 to Landlord, inclusive of contractually-allowable interest in the amount of $15,000.00.

The failure to timely remit rent payments to Landlord is a default under Section 17.1 of the Lease, permitting Landlord to, among other options, terminate the Lease after giving this Notice of Default if Tenant's default is not cured within thirty (30) days from the giving of this Notice.

Landlord reserves its rights and remedies generally, including, without limitation, the right to declare additional defaults under the Lease.

Respectfully,

Kenneth A. Sherman
Direct Dial: 617-456-8094
ksherman@princelobel.com

cc: Michael P. Ross, Esq.
    Michael Polacco

Date Filed 1/10/2023 10:54 AM
Superior Court - Middlesex
Docket Number

1                           L1

# COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
DEPARTMENT OF
THE TRIAL COURT

|  |  |
|---|---|
| DANIEL DEOLIVEIRA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ROYAL SUN FARM LLC | ) |
| and DAMON SCHMIDT, | ) |
| | ) |
| Defendants. | ) |
| | ) |

C. A. No. 2381CV00066

**RECEIVED**
1/10/2023

## COMPLAINT

Plaintiff Daniel DeOliveira brings this action against his former his employer, Royal Sun Farm LLC, and its manager, Damon Schmidt, for the failure to timely pay wages, including paid time off and bonuses, in violation of state law.

## **PARTIES**

1.   Plaintiff Daniel DeOliveira resides in Ashby, Massachusetts.

2.   Royal Sun Farm LLC ("Royal") is a domestic limited liability company with a usual place of business located at 69 Gardner Road, Hubbardston, Massachusetts 01452.

3.   At all relevant times, Defendant Damon Schmidt has served as manager of Royal and, on information and belief, has controlled, directed, and participated to a substantial degree in formulating and determining the policies of the company.

4.   Defendant Damon Schmidt set Plaintiff's rate of pay, controlled Royal's payroll – including whether, when, and in what amount Plaintiff was compensated – and set all major policies at Royal.

1

Date Filed 1/10/2023 10:54 AM
Superior Court - Middlesex
Docket Number

5.      On information and belief, Defendant Damon Schmidt resides at 10 Goffe Road, Lexington, MA 02421.

6.      The Defendants employed the Plaintiff.

## JURISDICTION

7.      This court has jurisdiction to address this matter pursuant to, *inter alia*, M.G.L. c. 149, § 150 and its inherent common law authority.

8.      The Plaintiff has filed a complaint regarding this matter with the Massachusetts Attorney General pursuant to M.G.L. c. 149, § 150.

9.      Venue is proper pursuant to M.G.L. c. 223 § 2 because Plaintiff and Defendant reside in Middlesex County.

## FACTS

10.     Royal is a cannabis growing company with locations in Hubbardston, Massachusetts and Royalston, Massachusetts.

11.     On or around April 1, 2022, Royal hired Plaintiff Daniel DeOliveira to work as a Director of Cultivation.

12.     Royal agreed to compensate Mr. DeOliveira with a base salary of $100,000.00 per year plus bonuses, as outlined below.

13.     Royal also agreed to provide Mr. DeOliveira with two weeks of paid time off (PTO) per year.

### *Bonus Structure*

14.     Royal agreed to compensate Mr. DeOliveira pursuant to an offer letter dated January 30, 2022 (the "Offer Letter"). A true and accurate copy of the Offer Letter is attached as Exhibit A.

15.     Pursuant to the Offer Letter, Royal agreed to pay Mr. DeOliveira harvest-related bonuses

as follows:

      a.   $25,000 four (4) weeks after Hubbardston's first harvest, estimated to occur at the

           end of July 2022;

      b.   $25,000 two (2) weeks after Hubbardston's second harvest, estimated to occur in

           September or October 2022; and

      c.   $25,000 four (4) weeks after Royalston's first harvest, estimated to occur in Fall

           2022.

16.     In order to count for a bonus, Royal required that the majority of each harvest pass

Massachusetts testing requirements and be sellable.

### *Unpaid Harvest Bonuses*

17.     The Hubbardston location completed its first harvest in the beginning of September 2022.

18.     On information and belief, this harvest passed Massachusetts testing requirements and

was sellable.

19.     Per the Offer Letter, Mr. DeOliveira earned a $25,000.00 bonus for the September 2022

Hubbardston harvest.

20.     Pursuant to the Offer Letter, Mr. DeOliveira's first harvest bonus was to be paid out no

later than the second week of October 2022.

21.     However, Royal failed to pay Mr. DeOliveira for his first harvest bonus for the

September 2022 Hubbardston harvest within six days of the pay period in which it was earned,

by the second week of October 2022, or at any point thereafter.

22.     Following the Hubbardston location's September 2022 harvest, Mr. DeOliveira

completed all planting and other work necessary to prepare the location for its second harvest.

23.     On information and belief, the Hubbardston location's second harvest was completed in

October or November 2022.

24.     On information and belief, this harvest passed Massachusetts testing requirements and

was sellable.

25.     Per the Offer Letter, Mr. DeOliveira earned a $25,000.00 bonus for the second

Hubbardston harvest.

26.     Pursuant to the Offer Letter, Mr. DeOliveira's second harvest bonus was to be paid out

no later than the two weeks after the harvest was completed.

27.     However, Royal failed to pay Mr. DeOliveira for his second harvest bonus for the second

Hubbardston harvest within six days of the pay period in which it was earned, within two weeks

after the harvest was completed, or at any point thereafter.

***Late Final Wages***

28.     Royal terminated Mr. DeOliveira's employment on October 2, 2022.

29.     M.G.L. c. 149, § 148 requires employers to pay terminated employees all earned wages,

including PTO and other accrued benefits, on the date of the employee's termination.

30.     As of the date of his termination, Mr. DeOliveira had earned but not been paid

approximately $4,166.67 in salary.

31.     In the week following his termination, Mr. DeOliveira requested that Royal pay him his

final salary on multiple occasions.

32.     Royal failed to pay Mr. DeOliveira this final earned salary until October 14, 2022, twelve

(12) days after the date of his termination.

33.     Additionally, as of Mr. DeOliveira's termination he had accrued but not used

approximately nine (9) days of PTO, the equivalent of approximately $3,461.53.

Date Filed 1/10/2023 10:54 AM
Superior Court - Middlesex
Docket Number

34.     After his termination, Mr. DeOliveira requested that Royal pay him his accrued and

unused PTO.

35.     Royal failed to pay Mr. DeOliveira any portion of his accrued and unused PTO on the

date of his termination or at any point thereafter.

36.     As of the date of this filing, Royal owes Mr. DeOliveira approximately $50,000 in unpaid

bonuses, approximately $3,461.76 in accrued unused PTO, and liquidated damages on his tardy

final salary payment.

## CAUSES OF ACTION

37.     For all counts that follow, the Plaintiff hereby realleges and incorporates by reference the

facts and allegations contained in the preceding paragraphs of this pleading as if fully set forth

herein.

## COUNT I

## NON-PAYMENT OF EARNED WAGES IN VIOLATION OF M.G.L. c. 149, §§ 148, 150

38.     M.G.L. c. 149, § 148 mandates the timely payment of all earned wages.

39.     Section 148 provides in relevant part:

> Every person having employees in his service shall pay weekly or
> bi-weekly each such employee the wages earned by him to within
> six days of the termination of the pay period during which the wages
> were earned … and any employee discharged from such employment
> shall be paid in full on the date of his discharge[.]

> M.G.L. c. 149, § 148.

40.     M.G.L. c. 149, § 148 further provides:

> The word "wage" shall include any holiday or vacation payments
> due an employee under oral or written agreement.

5

Date Filed 1/10/2023 10:54 AM
Superior Court - Middlesex
Docket Number

41.     By failing to timely pay the Plaintiff the full amount of his earned wages, including

salary, bonuses, and accrued, unused PTO, when the same became due and payable, the

Defendants violated the Weekly Payment of Wages Act, M.G.L. c. 149, § 148.

42.     The Defendants' failure to comply with M.G.L. c. 149, § 148 entitles the Plaintiff to

recover treble damages, interest, reasonable attorneys' fees, and costs pursuant to M.G.L. c. 149,

§ 150.

## COUNT II

### BREACH OF CONTRACT
### (Against Royal Only)

43.     The Plaintiff and the Defendant were parties to a contract under which the Defendant

agreed to and had a duty to timely pay the Plaintiff wages, including bonuses.

44.     The Defendant breached its contractual duty by failing to pay Plaintiff the wages due

pursuant to the terms of the contract.

45.     The Defendant's breach was material.

46.     As a result of the Defendant's breach, the Plaintiff suffered damages.

47.     The Defendant's breach was both the proximate and actual cause of Plaintiff's damages.

48.     The Defendant's breach of contract entitles Plaintiff to recover contract damages,

including but not limited to, incidental and consequential damages, and pre-judgment interest

from the date of the breach.

## COUNT III

### UNJUST ENRICHMENT
### (Against Royal Only)

49.     The Defendant received the benefit of Plaintiff's time, work, and professional skill

without compensating him for the same and as Plaintiff legitimately expected.

50.     The Defendant was unjustly and unfairly enriched by the amount of the unpaid wages, as

well as any profits it has made as a result of the Plaintiff's work.

51.     The Defendant benefited financially from its failure to pay the Plaintiff and, as a result,

the Plaintiff suffered damages.

WHEREFORE, the Plaintiff requests that the Court enter final judgment against the

Defendants, awarding the Plaintiff:

1.     Treble damages, interest, reasonable attorney's fees, and costs pursuant to M.G.L.
       c. 149, § 150 for the failure to timely pay earned wages;

2.     Contract damages and pre-judgment interest for breach of contract;

3.     Equitable damages for unjust enrichment; and

4.     Such other relief that the Court deems just.

## JURY DEMAND

THE PLAINTIFF DEMANDS A TRIAL BY JURY FOR ALL CLAIMS SO TRIABLE.

Respectfully submitted,

DANIEL DEOLIVEIRA,
by his attorneys,

*/s/ Raven Moeslinger*

Raven Moeslinger (BBO No. 687956)
Nicholas F. Ortiz (BBO No. 655135)
Law Office of Nicholas F. Ortiz, P.C.
50 Congress Street, Suite 520
Boston, MA 02110
(617) 338-9400
rm@mass-legal.com

Dated:  January 10, 2023

7

# EXHIBIT A

1/30/22

Dear Daniel DeOliveira,

Royal Sun Farm LLC is pleased to offer you the position of Director of Cultivation within our organization. We are excited about the potential that you bring to our company.

The terms of this offer of employment are:
- Full Time Employee
- $100,000 Salary
- Start day is between April 1st to April 15th, 2022
- Work Schedule is as required
- Responsibilities are to run the entire cultivation facility as detailed in the Cultivation Manager/Director of Operations Job Description to be signed
- 2 weeks paid time off in year 1
- Health Insurance (dental, medical, vision)
- Retirement Plan Match (401k etc.)
- Bonus Structure of:
    - $25,000 4 weeks after Hubbardston's first harvest (Estimated End of July 2022)
    - $25,000 2 weeks after Hubbardston's second harvest (Estimated September/October 2022)
    - $25,000 4 weeks after Royalston's first harvest (Estimated Fall 2022)
    To count for a bonus, the majority of the harvest must pass MA testing requirements and be sellable.
- Year two base salary will be $150,000 plus applicable bonuses.
- Agreement to help in the remaining planning for the cultivation facility in Royalston including water/fertilization system setup/planning, fans and light layout, and other requirements to become operational.
- Agreement to help in the remaining planning for the cultivation facility in Hubbardston including row layout, water/fertilization system setup/planning, and other requirements to become operational.

This offer is conditional upon the completion of registration as an agent with the Cannabis Control Commission.

In accepting our offer of employment, you agree to sign the Royal Sun Farm LLC Employee Handbook.

We look forward to your arrival at our company and are confident that you will play a key role in our company's growth.

Sincerely,

Damon Schmidt
Owner
Royal Sun Farm LLC
Accepted By:

_____                    1/31/22
Daniel DeOliveira                                   Date

_____                    1/31/22
Damon Schmidt - CEO                            Date